In the Matter of the Will of Margaret W. Durkee, Deceased.

Surrogate's Court, New York County, April 4, 1944.

*Eben E. Rand* for City Bank Farmers Trust Company, petitioner.

*Emmet, Marvin & Martin* for Bank of New York, as trustee, respondent.

*John M. Bovey* for Trudeau Sanatorium, respondent.

*McKercher & Link* for New York Medical College, Flower and Fifth Avenue Hospitals, respondent.

*De Forest & Elder* for Presbyterian Hospital in the City of New York, respondent.

DELEHANTY, S. On May 31, 1922, deceased transferred to a trustee bonds in the face amount of $40,000 with direction that the income thereon be paid to a person described in the indenture of trust as the " devoted and faithful personal maid and friend " of the grantor. Full power to revoke or alter the trust indenture was reserved to the grantor. As originally drawn the indenture required payment of the trust capital to the grantor if she survived her beneficiary, and provided that if the beneficiary survived deceased but died before the latter's husband the trust capital became payable to the husband. The indenture also provided originally that if the income beneficiary survived both the grantor and her husband the trust principal became payable ·to Trudeau Sanatorium, subject, however, to the right of the income beneficiary to appoint to whom she chose $10,000 out of the capital " free of all taxes ".

Deceased's husband died prior to June 14, 1937, and on that date she exercised the power reserved by her in the trust indenture and altered its terms for disposition of the trust principal so as to provide that upon deceased's death the whole trust principal (save for a sum of $10,000 continued in trust for the life of the beneficiary) should be paid to the beneficiary. The $10,000 fund ultimately is payable to Trudeau Sanatorium. Four days before she thus altered the trust indenture deceased executed a codicil to her will wherein she provided a legacy of $10,000 to the trust beneficiary who had not been mentioned in the will. In other respects deceased confirmed her will which, in general, provides that some tangible personalty and some realty shall pass to deceased's sister and that the residuary shall be put in trust. One third of the residuary is put in trust for deceased's sister with remainder to a niece, and the balance is put in trust for the niece with remainder to such persons as the niece shall appoint. The trustee has the right to invade principal for the benefit of each income beneficiary, and may distribute the respective trust principals to charities selected by it if, in the one case, the niece fails to survive the sister or, in the other, fails to appoint the principal of her own trust.

Under the terms of the *inter vivos* indenture the trustee must now reserve $10,000 out of the trust capital and continue to hold it so long as the income beneficiary lives. It must pay over the balance in its hands. The executor of deceased demands that the trust fund contribute a sum in excess of $5,000 to the estate taxes imposed by reason of deceased's death. This amount is asserted to be the trust's ratable share of estate taxes imposed on the entire tax estate of deceased. That tax estate included the *inter vivos* fund because of deceased's reserved right of revocation of the indenture. Deceased's executor invokes section 124 of Decedent Estate Law and asserts that its terms compel the contribution sought.

The trustee claims exoneration under article first of deceased's will which says: " I direct that all my just debts and funeral expenses be paid as soon as practicable after my decease, and that all inheritance, estate, transfer, succession, probate, legacy and death taxes or duties, imposed upon or in relation to any property owned by me at the time of my death, be paid out of my general estate as an expense of the administration thereof."

It has already been noted that the trust indenture originally gave no part of the trust principal to the income beneficiary

but did give her power to appoint $10,000 of the fund " free of all taxes ". The modification of the indenture made four days after the codicil says nothing respecting taxes unless the cancellation of the power to appoint part of the fund tax free carries some implication on the subject. It is to be observed here that the gift of $10,000 by way of the codicil is an outright one and that it is tax free perforce the republication of the exoneration clause in the will which is quoted above. The combination of benefits to the trust beneficiary under the codicil and the amended trust indenture equals the value of the *inter vivos* trust principal, plus the value of an income interest in $10,000 for the rest of the beneficiary's life.

The operative effect of the will and codicil is that the taxes on the $10,000 gift in the codicil, on the bequest of tangible personalty and on the devise of realty are charged wholly to the residuary which passes ultimately one third to the niece (if she survives the sister) and two thirds to the appointees of the niece if she exercises the power granted her. The residuary thus bears all estate taxes on the true estate of deceased. Parenthetic note should be made of the fact that deceased's *inter vivos* beneficiary is also income beneficiary of a testamentary trust created by will of deceased's husband. This fund was reported as part of the tax estate of deceased since she had, and exercised, a power of appointment over it. But because her appointees are charities no tax liability results and so as to this fund no question of tax allocation arises.

In issues of construction the courts look, generally in vain, for a Rosetta Stone to enable them to decipher the hieroglyphs used by draftsmen of wills and trust indentures. Here the instruments bear internal evidence of informed draftsmanship. Since section 124 of Decedent Estate Law was nonexistent in 1922 the text of the original indenture does not envisage it. But when the indenture was amended in 1937 and when the will and codicil were drawn in 1936 and 1937 respectively the matter of estate taxes had become of prime importance to testators and the apportionment of the tax burden a major problem in estate administrations. The court may reasonably draw the inference from the ratification of the will by the codicil, subject to the legacy addition in the latter, that the draftsman of the codicil and deceased considered the first article of the will and saw no need to enlarge its text respecting taxes. The exoneration clause is deemed to be republished as of the date of the codicil and clarification of the clause could readily have been effected then if desired. When the codicil

was drawn much had been written about the impact of estate taxes. A few of the many instances of such discussions may be seen in *Matter of Murdoch* (142 Misc. 186 [1931]); *Matter of Randell* (147 Misc. 358 [1933]); *Matter of Adler* (151 Misc. 338 [1934]); *Matter of Stern* (153 Misc. 442 [1934]); *Matter of Duryea* (156 Misc. 144 [1935]); *Matter of Starr* (157 Misc. 103 [1935]); *Matter of Rogers* (159 Misc. 86 [1936], affd. 249 App. Div. 238 [1936]); *Matter of Duryea* (250 App. Div. 305 [1937]). In *Matter of Duryea* (*supra*) this court had said (and the Court of Appeals approved [277 N. Y. 310]) that the maker of a will was to be deemed cognizant of the tax laws operative on his estate and that the courts would act on that assumption.

It was no new thing in 1936 and 1937 that property outside the true estate was includable in the tax estate. The informed Bar was then fully capable of stating with clarity the degree in which a testator desired his true estate assets to be burdened with taxes due to the inclusion of outside funds in his tax estate. It then was well known to the Bar that section 124 of Decedent Estate Law was passed for the express purpose of compelling beneficiaries of outside funds to bear an equitable share of tax burdens increased by their inclusion. It knew that the statute enforced contribution " except in a case where a testator otherwise directs in his will ". It was mathematically demonstrable, of course, that the inclusion of nonestate property generally caused the tax estate as a whole to pay taxes at a higher level and that even proration and contribution would still leave the true estate assets subject in most cases to heavier tax burdens than would have been incurred if true estate assets only had been taxed. If then this remedial statute is to serve its declared purpose, the courts should enforce contribution in every case where the will lacks *clear* direction that the tax burden due to inclusion of outside funds is to be discharged out of true estate assets. Lacking clarity in the language of the will the statute makes the rule and apportionment should be directed.

There is a tendency to deal with problems of tax apportionment as if dealing with dispositive text in which there is obscurity as to the extent of a gift or the identity of beneficiaries. As to such obscurities courts have as guides only the text of the will and the background against which it was drawn. Not so, in a problem of tax apportionment. There the statute states the rule. If those who contend for nonapportionment can point to nothing more than obscurity, the rule of

the statute must prevail. As in any trial issue mere creation of a doubt by one upon whom rests the burden of proof is not enough. The will is deemed to include the rule of the statute unless its text " otherwise directs ". There can be said to be a question of construction, of course, as to what the will " directs ", but in the solution of that question there is always operative the statutory canon which should be given the full weight which the history of the statute shows that it was intended to have.

The verb " directs " is used in the statute in its dictionary meaning. In the Standard Dictionary, " direct " is defined thus: " To determine the direction · of; especially to cause to point or to go straight toward a thing ". This dictionary also defines it thus: " To instruct or guide with authority; order; command." Among the synonyms given by this dictionary are " dictate " and " govern ". In the Century Dictionary the definition is: " To point or aim in a straight line toward a place or an object ". Another meaning is: " To control the course of; regulate; guide or lead; govern; cause to proceed in a particular manner ". Still another meaning is given: " To order; instruct; point out to, as a course of proceeding, with authority; prescribe to." These dictionary meanings seem to the court to make it clear that the statutory exception is to be satisfied only if there is found in the will a *command* or *dictation* that the equitable statutory rule for apportionment *is not to be applied*. Lacking such command, apportionment must be made. Both command and direction import *certainty*

Here the parties *speculate* as to what deceased really meant. The very arguments advanced by them show that there is no *certainty* to be found in the text of deceased's will. When she speaks of charges " imposed upon or in relation to any property owned by me at the time of my death " she is using language which in seventeen words says only the same thing as the five words " imposed upon * * * my general estate ". In one aspect her language can be treated as restrictive. When she says that the taxes to be paid are those " imposed * * * in relation to any property owned * * * at the time of * * * death ", she can be said to intend to make it clear that she *did not* want her general estate charged with taxes on funds which she did not own at her death. It is urged that since she had the power to cancel the *inter vivos* trust established by her and had the power to take the property back into her ownership she could have regarded it as " property owned " by her, though the legal

title was in the trustee, as she knew. But the fact is that she had established this fund in 1922 and not only had left it undisturbed for fifteen years so far as recapture is concerned but at the end of that decade and a half had undertaken an alteration which made the ownership of the greater part of the fund by her " devoted and faithful personal maid and friend " much more likely than before. In addition to that she had by codicil given the same beneficiary a substantial gift. It is contradictory of all we know of deceased's intentions, thus evidenced by her modification of the trust indenture and by her execution of the codicil, to suppose that she gave a thought to the revocation power reserved in the original indenture. Perhaps deceased was thinking of the fund which had been established by deceased's husband for the same beneficiary. Perhaps deceased did not have any thought on the subject at all. The language is almost certainly that of her draftsman. Only one thing is certain about this tax provision and that is that *in words* the payment out of the general estate is limited to taxes imposed upon property owned by deceased at the time of her death. There is no command or direction that the tax on any other property be paid.\* ▪ Probably deceased wanted to make sure that the taxes imposed upon her gift of tangible personalty and on her devise of realty would not burden her sister's resources but would be paid out of the general estate leaving the tangible gifts free of tax. Whether deceased had any special thought of freeing from tax contribution the $10,000 gift in the codicil is not so clear. That gift is in fact exonerated from contribution however.

When the court looks at the contention of the trustee of the *inter vivos* trust and notes the result which would follow approval of such contention, it sees that there would be imposed upon the funds designed to reach the niece one third of the tax in controversy and that there would be imposed on the sister of deceased the loss arising from deprivation of interest on two thirds of the amount of the tax. The beneficence of deceased toward the beneficiary of the *inter vivos* trust is not to be doubted but there is no reason to assume that deceased intended any sacrifice of her sister's benefits or of her niece's benefits in order to exonerate the *inter vivos* fund from tax contribution. On the assumption that the *inter vivos* fund has now a capital value of $34,000, the result to the *inter vivos* trust beneficiary of that instrument, as amended, and of the codicil

to the will is that the beneficiary will receive about $34,000 in hand if she makes no contribution to the tax and that she will receive about $29,000 if she contributes her fair proportion to the tax. Nowhere in this will or this codicil or this *inter vivos* trust indenture or in the amendment to it is there any indication that deceased felt that $29,000 was too small a beneficence. At the beginning of her plans for the beneficiary the latter had no right to take beneficially any of the capital. Her benefits have been vastly enlarged by the modified program of deceased in her behalf. Nothing in the consequences of applying the statutory rule and nothing in the relations of the deceased to her respective beneficiaries requires the court to read into deceased's text any purpose not explicitly found there.

Submit, on notice, decree settling the account, construing the will, and directing apportionment of estate taxes ratably as between estate and nonestate assets which have been taxed.